IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HUNTINGTON BANCSHARES INCORPORATED and HUNTINGTON INSURANCE, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> RYAN BURKE and ALLIANT INSURANCE SERVICES, INC., <br><br> *Defendant.* | Civil Action No. 2:20-cv-1159 <br><br> Hon. William S. Stickman IV |

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, District Judge

Plaintiffs Huntington Bancshares Incorporated and Huntington Insurance, Inc. ("Huntington") commenced this lawsuit in early August of 2020 against a former employee, Defendant Ryan Burke ("Burke"), and his new employer, Defendant Alliant Insurance Services, Inc. ("Alliant"). (ECF No. 1). Huntington alleges that Burke breached and continues to breach the restrictive covenants set forth in his 2006 Producer's Agreement by: "(a) using and disclosing Huntington's Confidential Information; (b) soliciting Huntington's customers; (c) accepting business from Huntington's customers; (d) soliciting or inducing Huntington's employees to discontinue their employment with Huntington; (e) causing Alliant to seek to employ Huntington's employees; and (f) failing to return to Huntington its property and Confidential Information." (ECF No. 1, ¶ 64). Huntington also alleges that Burke has breached and continues to breach the restrictive covenants in his 2017 Restrictive Stock Unit Grant Agreement and 2019 Restrictive Stock Unit Grant Agreement ("RSU Agreements") by: "(a)

1

using and disclosing Huntington's Confidential Information; (b) contacting Huntington's customers for purposes of identifying his change in employment; (c) contacting Huntington's customers for purposes of soliciting such customers to obtain a product or service offered by Huntington from Alliant; and (d) soliciting or inducing Huntington's employees to terminate their employment with Huntington or accept employment with Alliant." (ECF No. 1, ¶ 73). As to Alliant, Huntington alleges it has tortiously interfered with Burke's obligations under the Producer's Agreement and RSU Agreements by encouraging and permitting Burke to: "(a) use and disclose Huntington's confidential and proprietary information; (b) contact Huntington's customers for purposes of identifying his new employment and soliciting such customers to terminate their relationship with Huntington and obtain insurance products and services from Alliant; and (c) aid in Alliant's solicitation of Huntington's employees." (ECF No. 1, ¶ 82). Lastly, it contends that Alliant has tortiously interfered with Huntington's contractual and business relationships. (ECF No. 1, ¶¶ 33-90).

Pending before the Court is Huntington's Motion for Preliminary Injunction. (ECF No. 3). On August 10, 2020, the Court granted a temporary restraining order against Defendants. (ECF No. 15). Thereafter, in September, the Court held an extensive evidentiary hearing that involved two days of testimony from seven witnesses spanning approximately sixteen hours. (ECF Nos. 37 and 38). In the Court's estimation, the credible evidence of record more than suffices to demonstrate that Huntington is likely to succeed on the merits of its breach of contract and tortious interference claims against Defendants and that the other prerequisites necessary to secure a preliminary injunction have been satisfied. For the foregoing reasons, the Court will grant a preliminary injunction.

## I.   STANDARD OF REVIEW

The grant or denial of a preliminary injunction is within the sound discretion of the Court. *See American Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotations omitted). The primary purpose of preliminary injunctive relief "is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994). "Status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The decision to issue a preliminary injunction is governed by the following four-factor test, wherein the movant must demonstrate:

> "(1) that [it is] reasonably likely to prevail eventually in the litigation and (2) that [it is] likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiff[...] and (4) whether granting relief would serve the public interest."

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013). As noted, if the movant meets the first two "gateway factors," a court then determines whether all four factors, taken together, balance in favor of granting the relief sought. *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019). In reaching its decision on the request for injunctive relief, a court sits as both the arbiter of legal disputes and trier of fact and is therefore tasked with resolving factual disputes and assessing the credibility of witness testimony. *See e.g., Hudson Global Resources Holdings, Inc. v. Hill*, Civ. A. No. 07-132, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007) ("A court considering whether to grant a preliminary injunction

3

may assess the credibility of witnesses testifying before it at a preliminary injunction hearing, and base its decisions on credibility determinations.").

## II.   FACTUAL BACKGROUND

The following facts emerged from the testimony and exhibits introduced at the evidentiary hearing:

Burke joined his father's insurance agency, the Peter B. Burke Agency, Inc. ("Burke Agency"), in 2004.  On January 3, 2006, Burke Agency merged into Sky Insurance, Inc. and Sky Financial Group, Inc. ("Sky Insurance") and Burke and his father became employees of Sky Insurance.  All of the Burke Agency customers became customers of Sky Insurance.  (ECF No. 37, pp. 24-38, 144; ECF No. 38, p. 88; ECF Nos. 40-2 and 42-8).  Burke executed a Producer's Agreement as part of the merger.  (ECF No. 37, pp. 35, 145-47; ECF No. 42-10).  In December of 2008, Sky Insurance merged with Huntington, and Burke became a Huntington employee and Sky Insurance customers became Huntington customers.[1]  (ECF No. 37, p. 28; ECF No. 42-9). As a Producer and Sales Executive, Burke worked as a surety bond and insurance policy broker in Huntington's Pittsburgh office.  The insurance brokerage business is competitive and relationship driven.  Burke's book of business was worth approximately $1.3 million and he had many long term customers, including some from his father's insurance agency. (ECF No. 37, pp. 39-40, 110; ECF No. 38, pp. 85-86, 90, 173; ECF No. 42-12).  In both 2017 and 2019, Burke received Restricted Stock Unit ("RSU") Agreements for stock.[2]  (ECF No. 37, pp. 37-38).  Burke

---

[1] Huntington is a commercial and personal insurance agency that offers insurance products from leading insurance companies.  It also offers surety bonds.  (ECF No. 1, ¶ 23).

[2] In 2017, Burke was nominated to receive stock.  In 2019, because he was a producer of a certain size he was eligible to receive stock.  (ECF No. 37, pp. 37-38).  The RSUs were not tailored for any particular Huntington Insurance position.  For cause termination forfeited any unvested stock units.  (ECF No. 37, pp. 165-66).

was paid solely on commission and RSUs, and, in 2019, he received $400,000.00 in total compensation. (ECF No. 37, pp. 33-34, 110-11). Huntington paid for his travel and entertainment expenses, sponsorships at events (e.g. golf outings), license renewals, continuing education, support staff (i.e. account executives, technicians, and managers). (ECF No. 38, p. 86).

On June 10, 2020, Burke was placed on suspension by Huntington while it conducted an internal investigation into his conduct. One of Burke's customer's, Sideline Trees, insurance policies had been canceled, effective May 22, 2020, due to nonpayment by the insurer - Crum & Forester. On June 3, 2020, one of Sideline Trees' employees, who was under the influence of alcohol, was involved in a vehicular accident with a police officer that resulted in the officer's death. Sideline Trees contacted Burke and they had a conversation that resulted in Sideline Trees making payment that day on their insurance policy, but not divulging to Crum & Forester information about the vehicular accident. On June 8, 2020, Crum & Forester stated that it would not reinstate the Sideline Trees' insurance due to Sideline Trees' poor payment and claim history. That same day, Burke, knowing about the accident, called Crum & Forester and had a forty-five minute conversation with the underwriter wherein he pleaded for reinstatement, but never advised the underwriter of the fatal accident. Now, upon information ascertained in discovery, Burke contends that his primary reason for reinstatement was that Crum & Forester had not sent the 15-day notice of intent to cancel. Not knowing of the fatal accident, Crum & Forester reinstated Sideline Trees' insurance policy on June 8, 2020. Sideline Trees submitted a claim for the fatal accident on June 9, 2020. Not surprisingly, the underwriter who spoke with Burke was quite upset and Crum & Forester's legal team directed the underwriter to have no further contact with Burke. (ECF No. 37, pp. 40-46; ECF No. 38, pp. 35-41).

During Huntington's internal investigation of Burke's conduct, Burke stated that his failure to disclose the accident to the insurer was only a "business lie," which is different than a lie. (ECF No. 37, p. 46; ECF No. 38, pp. 41-42). He also went so far as to state that he was "going to play dumb" and "stick his head in the sand" if Crum & Forester had questioned the claim. (ECF No. 37, p. 47; ECF No. 38, p. 42). Huntington terminated Burke on June 18, 2020 "for Cause" under the 2006 Producer's Agreement because of "dishonesty" in failing to report the accident to the underwriter, in failing to inform management of what was occurring with Sideline Trees, and in his discussions with Huntington management during their internal investigation.[3] (ECF No. 37, pp. 47-48, 163-64; ECF No. 38, p. 43; ECF No. 42-16).

Nevertheless, Burke believes his behavior was acceptable; he testified that he is proud that he stood behind his customer, and he has gone so far as to defend his conduct with the Crum & Forester underwriter on the basis that "a lie by omission is not a lie." (ECF No. 38, pp. 84, 94). In Burke's opinion, "the agent exists because insurance companies will take advantage of situations and escape liability if they are not held in check and held accountable." (ECF No. 39, p. 92).[4]

---

[3] "Cause," as applicable to Burke under the Producer's Agreement, was defined as "commission of any fraud, theft, dishonesty, embezzlement, or substantially similar acts by Employee in the course of his employment [...]." (ECF No. 42-10, ¶11.C.(i).

[4] In a more bizarre twist to this case, at 11:52 p.m. on the evening of the first day of the evidentiary hearing regarding the instant motion for preliminary injunction, Burke personally sent an email to his former supervisors at Huntington with a letter attached notifying them that he was proceeding forth with a wrongful discharge claim. Also attached to the email was a photograph of what appears to be a bank teller with his thumbs up and a letter in front of him. (ECF No. 38, pp. 83-84; ECF No. 42-130). According to Burke, "I hand-delivered the letter to Huntington downtown in the nick of time," despite being well aware of the identity of Huntington's counsel. (ECF No. 38, pp. 84-85, 89).

Huntington Human Resources Officer Steve Phillips spoke with Burke on June 19, 2020. Burke asked if he could contact his Huntington customers regarding his termination. Phillips referred Burke to his non-solicitation agreements and stated that Burke was required to comply with the agreements. If Burke had further questions about communications with his former customers, Phillips directed Burke to speak with "legal." When Phillips was pressed by Burke as to whether he could contact his friends, Phillips responded that he could not tell Burke what or what not he could talk to his friends about. (ECF No. 40-5, ¶¶ 7-11).

Part of Burke's 2006 Producer's Agreement included a three-year restrictive covenant stating he would not directly or indirectly solicit or attempt to solicit from Huntington any customer or employee or utilize any confidential information. (ECF No. 37, pp. 36, 168; ECF No. 42-10, ¶¶ 12, 13). Likewise, Burke's 2017 and 2019 RSUs contained one year restrictive covenants for non-solicitation of customers and employees. (ECF No. 37, pp. 37-38; ECF Nos. 42-13 and 42-14). On June 19, 2020, Huntington sent Burke a letter reminding him of his post-employment confidentiality and restrictive covenant obligations. (ECF No. 37, p. 48; ECF No. 38, p. 43; ECF Nos. 42-18 and 42-85). When Huntington employees began reaching out to Burke's former customers, they learned that Burke had already been in contact with many of them. Additionally, they learned that Burke had contacted Huntington employees. (ECF No. 37, pp. 50-51, 53-55, 79-81, 119-20, 125-27, 152, 159-60; ECF No. 42-6). On June 26, 2020, counsel for Huntington sent Burke a letter reminding him of his restrictive covenants. (ECF No. 37, p. 51; ECF No. 42-19). This was followed by a July 28, 2020 letter reiterating the restrictive covenants. (ECF No. 37, p. 52; ECF No. 42-20). Also of concern to Huntington was Burke's

failure to return information deemed confidential until August 3, 2020.[5]   (ECF No. 37, p. 52). Huntington learned that Burke had joined Alliant in late July, and then in early August it began to receive Broker of Record ("BOR") letters for a number of Burke's Huntington customers transferring their accounts from Huntington.   (ECF No. 37, pp. 51-53).

Following Burke's termination, both he and his father called Burke's customers, told them of Burke's termination, and provided an explanation so as to make sure customers knew Burke was, as he characterized it, someone who would stand by a customer.   They spoke with some customers multiple times.   Some customers said they would follow Burke wherever he gained employment.   Some customers requested Burke notify them once he had a new employer. To other customers, Burke or his father offered to reach out once Burke obtained a new employer.[6]   (ECF No. 37, pp. 69-70; ECF No. 38, pp. 20, 45-49, 95, 101-06, 121, 123, 125-30, 138-39, 132-33, 142; ECF Nos. 40-4, 42-24 and 42-119).   Burke has readily admitted that he spoke to most of his customers after being terminated by Huntington before obtaining new employment.   (ECF No. 38, p. 53).

---

[5] On August 3, 2020, Burke dropped off a box of documents at the Huntington office in Pittsburgh.   (ECF No. 38, pp. 66, 99).   When pressed as to why he waited from the date he received the letter on June 18, 2020 requesting he return Huntington information until August 3, 2020, Burke stated, "I didn't see what the rush was." And, "[n]one of the documents I had felt were really relevant anyway." Yet, the materials he returned included a Dropbox account, a MacBook, and proposals and information about customers.   (ECF No. 38, pp. 66-69).   Following the Court's issuance of the August 10, 2020 temporary restraining order, Burke compiled an itemization of all the Huntington material that remained in his possession.   He had significant financial and loss run information on his customers as well as customer lists.   Burke clarified during his testimony that it was "15 years of information."   (ECF No. 37, pp. 83-84, 89; ECF No 38, pp. 69-72, 99; ECF Nos. 42-93, 42-102).   Due to the COVID-19 pandemic, Burke was working remotely from March through June.   (ECF No. 37, pp. 86-87).

[6] In Burke's mind, "if a client agrees to have us at a predetermined date reach out to them, that's an agreement and I can't think would be construed as solicitation."   (ECF No. 38, p. 141).

Burke marketed himself to potential new employers as having a significant book of business ($1.4 million) with clients that would follow him. (ECF No. 38, pp. 17-19). One of his pitches to a prospective employer, Seubert, included hiring his colleague, Mary Ann Masullo, who had no restrictive covenants and produced $40,000.00 worth of revenue on her own. Burke suggested that she could solicit Burke's former Huntington customers and his customers could be assigned to Masullo until his non-solicitation restrictive covenants expired. During these discussions, Burke made statements to the effect that "scorched earth" tactics would win the day with Huntington, his book of business could be bought for a "song" in a settlement, and "good luck with Huntington getting a timely TRO" if they sued him. (ECF No. 38, pp. 20-31; ECF No. 42). Suffice it to say, Burke was well aware of his restrictive covenants and he plotted various ways to evade them functioning under the assumption that "all these disputes end in settlements [...]." (ECF No. 38, p. 26). He believed that Huntington "would just want to come to the table and resolve the matter," and not sue him. (ECF No. 38, pp. 29-30).

Burke expressed interest in Alliant to Jim Bly, the Managing Director of Alliant's Pittsburgh office, whom he knew personally. On June 16, 2020, Burke sent Bly his 2016 Producer's Agreement. (ECF No. 38, pp. 32, 179, 184-85; ECF No. 42-83). Bly never read or reviewed the agreement, but he forwarded it to counsel and then relied upon counsel's representation of the agreement. (ECF No. 38, pp. 185, 203-05). Alliant is a private equity owned national broker that has over 4,000 employees with $1.7 billion of revenue. They have over nine industry practices. (ECF No. 38, p. 183). On June 24, 2020, Burke sent Bly the letter from Huntington regarding his post-employment confidentiality and restrictive covenant obligations. He also forwarded to Bly the June 26, 2020 letter from Huntington's counsel reminding him of his restrictive covenants. (ECF No. 38, pp. 44-46).

9

Bly talked with Burke "about his book of business as part of the overall discussion with him joining Alliant." (ECF No. 38, p. 185). To his colleagues, Bly stated, "we will hire staff to service his book. This should not be overwhelming for our team as I know we are running hot." (ECF No. 38, p. 202). During negotiations with Alliant, Burke wanted indemnification in the event he got sued. (ECF No. 38, pp. 49-50). Bly, who thought Burke to be very talented with a strong reputation in the industry, advocated hiring Burke, because "he has $1.4M of revenue and I know a number of the clients personally. It's a good, clean, profitable book of business." (ECF No. 38, pp. 181, 185, 200; ECF No. 42-83). Burke accepted a position with Alliant on July 13, 2020 and was ultimately hired by Alliant on July 15, 2020, despite the company having a hiring freeze in place. (ECF No. 38, pp. 50, 134, 187, 199). As part of his Employment Agreement with Alliant, Burke was awarded indemnification and he agreed to a two-year restrictive covenant regarding non-solicitation if he left Alliant.[7] (ECF No. 38, pp. 50-51; ECF No. 42-86). He was awarded a base salary of $150,000.00 and a $75,000.00 signing bonus. The rest of his compensation was based on a chart that laid out an agreement of compensation. Additionally, Burke would earn a $75,000.00 bonus if he achieved $800,000.00 in Annualized Revenue at the conclusion of his first twelve months of employment. (ECF No. 38, p. 51; ECF No. 42-86).

Burke compiled lists of his Huntington customers' email addresses and provided them to Bly to send out announcements regarding Burke's new employment. The email that was sent out by Alliant included Burke's and Alliant's contact information, and some emails contained a slide show highlighting the advantages of Alliant. Burke and Bly discussed Burke's Huntington

---

[7] When pressed on the fact that Alliant frequently finds itself in lawsuits regarding new employees' violating prior employers' restrictive covenants, Bly responded, "Alliant hires a lot of talented individuals that have a following. It's a relationship business. So when you hire talent, oftentimes business follows." (ECF No. 38, p. 206). Bly further acknowledged that Alliant was willing to aggressively fight lawsuits involving noncompete issues. (ECF No. 38, pp. 207-08).

customers and their backgrounds.  Bly contacted certain customers.  Many of the emails sent out by Alliant did not include Burke until the customer was on-boarded with Alliant because, as Burke admitted, "I think the spirit of that was to make a good faith effort to comply with the acceptance provision of my producer contract."  Nevertheless, Burke also texted, called, emailed and/or personally met with Huntington customers to follow up on the announcement, let them know he was now employed by Alliant and why he joined Alliant, and discussed (or attempted to discuss) the advantages of Alliant.  (ECF No. 37, pp. 52-54, 57- 78, 181; ECF No. 38, pp. 9-10, 13, 55-59, 106-18, 120-28, 188-89, 196-98,  204-06; ECF Nos. 40-4, 42-22 and 42-24; Defense Exhibit A439).  Bly gave Burke guidance on his restrictive covenants that included Burke being able to contact his Huntington customers, but that he should "try not to call anyone more than once."  (ECF No. 38, pp. 52, 54, 97, 188).  According to Burke, he could speak with his customers because he began a dialogue with them before obtaining employment at Alliant, and "there was an expectation for a return call or a follow-up to the announcement." (ECF No. 38, p. 53).

As of the date of the evidentiary hearing, seventeen of Burke's former Huntington customers sent broker of letter records to Huntington stating they were moving some lines of business.  (ECF No. 37, pp. 28-30; ECF No. 38, pp. 58, 160; ECF No. 42-21).  Seven of those customers originated from the merger of the Burke Agency.  (ECF No. 37 p. 29; ECF No. 42-21).  By the time Huntington filed its post-hearing brief, twenty-one of Burke's former Huntington customers sent broker of letter records to Huntington stating they were moving some lines of business.  (ECF No. 54, p. 28).

Prior to starting with Alliant, Burke, upon Bly's request, also suggested Huntington employees (i.e., Mary Ann Masullo, Diane Pavilanos, Melissa Horner, and Julie Johnston) that

Alliant could entice to leave Huntington and join Alliant. (ECF No. 38, pp. 72-76, 189, 208-10, 212). Bly spoke with Diane Pavilanos in early June, but decided he was not interested in her. (ECF No. 38, p. 198).

As to Masullo, who Burke had worked with since 2004, he testified, "[w]e've known each other for years. We go way back. And I expressed a desire to continue to work with her, and she knew I was considering Alliant. And, you know, what is considered recruitment? I didn't feel I was recruiting her, but after I engaged with Alliant, I stopped contact on those matters, on those discussions." (ECF No. 38, pp. 72, 78, 144). Burke acknowledged that Bly knew he wanted to continue to work with Masullo, and he forwarded her contact information to Bly. He also shared his guess as to Masullo's income package at Huntington. Furthermore, Burke knew about Bly's discussions with Masullo in late June and expressed hope that Bly would send an employment offer letter. (ECF No. 38, pp. 73-74, 76-81; ECF No. 42-46).

Masullo confirmed that around the time of Burke's termination, he indicated that he wanted her to join him wherever he went next. She agreed to speak with Alliant as a favor to Burke, and received a telephone call from Bly (who she knew from her work in the industry) at the end of June. At that time, Burke had yet to accept a position with Huntington. Afterwards, she told Burke that she was not interested in moving to Alliant. Masullo described Burke as "relentless," and, therefore, she agreed to speak with other individuals at Alliant who she expressly told that she was not interested in making the move to Alliant. (ECF No. 38, pp. 148-52, 169-71, 190). On July 24, 2020, she received a telephone call from Bly. Bly extended an aggressive employment offer, including a $75,000.00 signing bonus, that was much higher than the compensation she received at Huntington. There was no doubt in her mind that Burke wanted her to leave Huntington and continue to work with him. Burke was well aware that she

had an unenforceable noncompete and that she could secure Huntington customers. (ECF No. 38, pp. 154-55, 171-72). She declined the offer from Alliant, but she shared the details of the offer with Huntington and they increased her salary and awarded her stock. (ECF No. 38, p. 172). Masullo became aware of the fact that some customers thought she was moving to Alliant based on discussions they had with Burke. (ECF No. 38, pp. 157-58, 163-64, 168). This prompted her to send out an email to ten or twelve Huntington customers that she worked with alongside Burke that she was not leaving Alliant. (ECF No. 38, pp. 159, 164, 169). She knew nothing of the fact that Burke had pitched her employment to Seubert during his discussions with them in June. (ECF No. 38, p. 156).

As to Horner, Burke was her mentor and friend. She began working with Burke at Huntington in November of 2016. (ECF No. 38, pp. 221, 224-26). Horner testified that she was unhappy with Alliant after her January 2019 review. (ECF No. 38, p. 219, 220-24, 238). In April of 2020, she began working with recruiters as it was her intention to leave Alliant. (ECF No. 38, pp. 220, 224, 236-37). Burke had thirteen plus hours' worth of "personal" telephone conversations with Horner from June until the date of her testimony at the evidentiary hearing and they exchanged a plethora of text messages. (ECF No. 38, pp. 81, 226-27, 237). Once he was terminated by Huntington, Burke said he could not solicit Horner and that it was her choice as to what she would do with her career. (ECF No. 38, p. 227). Yet, during their conversations, they spoke about Burke's various job opportunities. (ECF No. 38, pp. 248-49). When she learned that Burke joined Alliant, Horner went onto Alliant's website on July 22, 2020 and found Jim Bly and sent him an email. Additionally, Horner reached out to Bly on Linkedin, and Bly responded knowing that she was one of the names Burke provided as someone Alliant should hire from Huntington. Horner did not know that Burke had identified her as someone Alliant

should consider hiring.  On July 30, 2020, Horner had a telephone interview with Bly.  Horner sent Alliant a formal job application on August 3, 2020.  Her salary request was $85,000.00, and Alliant offered her employment on August 24, 2020 consisting of $80,000.00 in salary plus a $10,000.00 signing bonus.  (ECF No. 38, pp. 193-95, 209-10, 212-15, 231-36, 24-42).  Notably, prior to the offer, Horner had telephone calls with Burke on the 11th, 17th, and 19th of August and she admittedly spoke about her potential employment with Alliant, but was quick to state that "at no point in time did he encourage me or solicit me to come to Alliant," and he simply "encourange[d] me to do what was best for my career."  (ECF No. 28, pp. 244-46).  On the day she received the offer from Alliant, she had a forty-four minute telephone conversation with Burke.  (ECF No. 244-45).  Horner resigned from Alliant on August 25, 2020, and accepted the position on August 31, 2020 with Alliant.  (ECF No. 38, pp. 213, 218, 236, 249).

Thus, as of the evidentiary hearing, Alliant offered two Huntington employees employment and one employee actually left Huntington for employment with Alliant.

### III.   ANALYSIS

The Court is persuaded for the reasons set forth below that Huntington has met its burden of showing that preliminary injunctive relief is warranted.

**A.  HUNTINGTON HAS DEMONSTRATED A REASONABLE PROBABILITY OF SUCCESS ON THE MERITS AS TO THE BREACH OF CONTRACT CLAIMS AGAINST BURKE.**

Having carefully reviewed the evidence and evaluated the credibility of the testifying witnesses in light of the parties' arguments, the Court holds that Huntington is likely to succeed on the merits of its breach of contract claims against Burke.  Demonstrating a likelihood of success on the merits for a preliminary injunction requires only that the party "prove a *prima facie* case, not a certainty that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*,

276 F.3d 160, 173 (3d Cir. 2001) (internal citation omitted).  Huntington has more than exceeded this standard.

To prove a breach of contract claim under Ohio law,[8] a party must prove (1) the existence of a binding contract or agreement, (2) that it performed its contractual obligations, (3) that the other party failed to fulfill its contractual obligations without legal excuse, and (4) that it suffered damages as a result of the breach. *Garofalo v. Chicago Title Ins. Co.*, 661 N.E.2d 218, 226 (Ohio Ct. App. 8 Dist. 1995) (citation omitted).  This case deals with the breach of restrictive covenants.  Ohio law does not strictly prohibit restrictive covenants, but cautions that they must be carefully scrutinized.  *Lake Land Emp. Group of Akron, LLC v. Columber*, 804 N.E.2d 27, 30 (Ohio 2004).  A restrictive covenant is upheld when it is supported by adequate consideration and is reasonable.  *Id.* at 901-03.  *See also Briggs v. Butler*, 45 N.E.2d 757, 761 (Ohio 1942) (restrictive covenants are valid and enforceable if they are: (1) ancillary to an employment agreement; and (2) reasonable). The Ohio Supreme Court has adopted a "reasonableness" standard for restrictive covenants, which is to be determined on a case-by-case basis. *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975).  A party seeking to enforce such a contract must show, by clear and convincing evidence, that the restrictive covenants are (1) not greater than is required for the protection of the employer, (2) do not impose undue hardship on the

---

[8] The Producer's Agreement and the RSU Agreements specify that Ohio law governs. (ECF No. 42-10, ¶22.E; 42-13, ¶ 20,; 42-14, ¶20(a)).  "Courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them" (*Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994)) except in situations where either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (citation omitted).  The parties have failed to articulate any material differences between Ohio and Pennsylvania law regarding restrictive covenants, and they have failed to mount any persuasive argument as to why Pennsylvania law should apply.  Therefore, the Court will abide by the choice of law provisions in the Agreements.

employee, and (3) are not injurious to the public. *FirstEnergy Solutions Corp. v. Flerick*, 521

Fed.Appx. 521, 525–26 (6th Cir. 2013) (citing *Raimonde*, 325 N.E.2d at 544).   Courts are to

consider the following factors in assessing reasonableness:

> [W]hether the covenant imposes temporal and spatial limitations, whether the
> employee had contact with customers, whether the employee possesses
> confidential information or trade secrets, whether the covenant bars only unfair
> competition, whether the covenant stifles the employee's inherent skill and
> experience, whether the benefit to the employer is disproportionate to the
> employee's detriment, whether the covenant destroys the employee's sole means
> of support, whether the employee's talent was developed during the employment,
> and whether the forbidden employment is merely incidental to the main
> employment.

*Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (citing *Raimonde*, 325 N.E.2d at

544).

The restrictive covenants set forth in the Agreements are valid and enforceable.  The facts

before the Court established that:  Huntington had a valid business interest to protect, and the

covenants were reasonably limited in their scope to protect this interest; the restraint did not

unduly harm Burke; and, the covenants were not injurious to the public.  The Agreements were

an integral part of Burke's employment.   The consideration for these Agreements was the

continued at-will employment of Burke and his receipt of stock options.

Burke entered into the Producer's Agreement in 2006 as part of his employment with Sky

Financial.  The Burke Agency merged into Sky Insurance in 2006 and Burke's father, the sole

shareholder, received cash and shares in Sky Financial.  As part of the merger, Burke and his

father became employees of Sky Insurance.  Burke executed a Producer's Agreement as part of

the merger.  It set forth the nature and conditions of his employment.  The Agreement was

transferred to Huntington in the merger with Sky Financial.[9]   The restrictive covenant that was

part of the Producer's Agreement stated that for three years after termination of Burke's

employment "for any reason whatsoever" he shall not directly or indirectly:

(i)     cause, solicit or accept from any Customer any business relating to, similar to, or competitive with the Employer's Business, specifically recognizing that this prohibition extends not only to solicitation when initiated by the Employee, but also to instances wherein Employee responds to inquiries or communications initiated by Customer;

(ii)    directly or indirectly, in one or a series of transactions, recruit, solicit or otherwise induce or influence any partner, director, officer, employee, sales agent, joint venture, investor, lessor, supplier, agent, representative or any other Person which has a business relationship with the Employer or had a business relationship with the Employer within the six (6)-month period preceding the date of the incident in question, to discontinue, reduce or adversely modify such employment, agency or business relationship with the Employer; or

(iii)   employ or seek to employ or cause any Competitive Business to employ or seek to employ any Person or agent who is then (or was at any time within six (6) months prior to the date Employee or the Competitive Business employs or seeks to employ such Person) employed or retained by Employer.

(ECF No. 42-10, ¶¶ 13, 21).  The introduction to this restrictive covenant stated:

Employee acknowledges that by virtue of and during his employment with Employer, he will have access to special knowledge of the Employer, its Confidential Information, its past, present and prospective customers and its employees, agents and affiliates.   Further, Employee acknowledges that the unauthorized use of that special knowledge or interference in those relationships would cause irreparable injury to the Employer.  In consideration of the foregoing and this Agreement, Employee makes the covenants and agreements set forth below.

(ECF No. 42-10, ¶ 13).   This agreement also prohibited Burke from disclosing Huntington's

confidential information.  (ECF No. 42-10, ¶¶ 12, 21).  Furthermore, upon termination, Burke

---

[9] Under Ohio law, employee noncompete agreements transfer by operation of law to the surviving company after a merger.   The surviving company can enforce such agreements provided they are reasonable under the circumstances of the case.  *Acordia of Ohio, L.L.C. v. Fishel*, 978 N.E. 2d 823 (Ohio 2012).

was to return all Huntington property, including all customer information and data.  (ECF No. 42-10, ¶ 17).

Burke then entered into an RSU Agreement in 2017 for 3,422 stock units, and then, in 2019, he entered into an RSU Agreement for 2,081 stock units.  Both agreements stated that Huntington "desires to compensate Employee with a grant of Restricted Stock Units to provide an incentive for the Employee to continue to perform future services to the Company."  (ECF Nos. 42-13 and 42-14). Not only did the Agreements contain vesting provisions, but they contained forfeiture provisions for unvested stock if Burke was terminated for Cause.  (ECF Nos. 42-13 and 42-14).   As part of the agreements, Burke agreed that for one year after his employment ceased, he would not directly or indirectly:

1. Solicit, encourage, or induce any person employed by the Company, or attempt to solicit, encourage or induce any person employed by the Company, to terminate their employment with the Company or to seek or accept employment with any other person or entity; or
2.  Contact or attempt to contact any customer or prospective customer of the Company for whom the Employee performed any services or had any direct or indirect business contact for the purposes of identifying the Employee's new association or change of employment or current affiliation; or
3. Contact any customer of the Company for whom the Employee performed any services or had any direct or indirect business contact for the purpose of soliciting, influencing, enticing, attempting to divert, or inducing any such customers to obtain any product or service offered by the Company from any person or entity other than the Company; or
4. Contact any customer or prospective customer of the Company whose identity or other customer specific information the Employee obtained or gained access to as an employee of Company for the purpose of soliciting, influencing, enticing, attempting to divert, or inducing any such customers or prospective customers to obtain any product or service provided by the Company from any person or entity other than the Company; or
5. Accept or provide assistance in the accepting of business from any customers or any prospective customers of the Company for whom the Employee performed any services or had any direct or indirect business contact, or whose identity or other customer specific information the Employee gained access to as an employee of the Company.

(ECF Nos. 42-13 and 42-14).   These agreements also prohibited Burke from disclosing Huntington's confidential information.  (ECF Nos. 42-13 and 42-14).

The Court rejects Defendants' argument that the 2019 RSU Agreement superseded the prior agreements, specifically the 2006 Producer's Agreement.  Section 21 of the 2019 RSU Agreement merely states that it supersedes any previous written or oral agreements "relating to the subject matter hereof." (ECF No. 42-14, ¶21).  There is no question that the subject matter of the 2019 RSU is the grant of restricted stock units to Burke.  (ECF No. 42-14, p. 1).  Not only does the 2016 RSU not set forth terms and conditions related to the nature of Burke's employment, but there is no language that its terms and agreements were meant to supersede the 2006 Producer's Agreement.  In fact, the 2019 RSU does not even mention the 2006 Producer's Agreement.  It is also of note that the 2006 Producer's Agreement specifically states that the terms of the restrictive covenants survive termination of the agreement and that it stands apart from any stock option plans.  (ECF No. 42-10, ¶¶13(D) & 22(D)).

At this juncture, the Court finds the restrictive covenants in the Producer's Agreement and RSU Agreements to be reasonable.  The evidence presented demonstrates that the restrictive covenants are necessary to protect Huntington's interest in its customers, customer goodwill, employees, and other confidential information.  Burke had access to Huntington's trade secrets and confidential information, including customer lists, pricing information, and business strategy.[10]  The restrictive covenants, as enforced, will only bar Burke from soliciting Huntington

---

[10] When an employee has access to confidential information, and when an employee's customer contacts occurred because of his employment, a legitimate business interest is likely to be present. An Ohio state appellate court expanded on this issue:

> An employer has a legitimate interest in limiting not only a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established client, but also in preventing a former employee from using his former employer's customer lists or

customers and employees as well as using its confidential information.  Burke's new employer, Alliant, with whom he knowingly and willingly negotiated a two-year restrictive covenant regarding non-solicitation, is a national company and Burke can continue to work in his chosen profession.  After three years, Burke can contact any Huntington customers that he chooses.  The covenants do not unduly restrict the employment opportunities of Burke as he has already found new competitive employment and he can interact with any customers except those of Huntington.  The Court holds that the restrictive covenants are reasonable in scope and length. No evidence exists that the restrictive covenants are injurious to the public.  In fact, the Court finds that the public interest is served by preventing unfair competition and by upholding valid contracts between employers and employees.  Consequently, the Court finds the restrictive covenants to be reasonable in all respects, and, therefore, valid and enforceable.

Additionally, the Court finds that Huntington has shown by clear and convincing evidence a substantial likelihood that Burke failed to fulfill his contractual obligations and has breached the Agreements.   Burke was terminated by Huntington for Cause for engaging in dishonesty.  In his post-hearing briefing, Burke has stated that his "performance may not have been perfect" as to his restrictive covenants, but that he did not "materially breach the covenants." (ECF No. p, 10).  The Court disagrees.  The voluminous evidence put forth demonstrates that, at the very least, a substantial likelihood exists that Burke directly and indirectly solicited his customers to join Huntington and that he had confidential and proprietary

---

contacts to solicit new customers. * * * In addition, an employer has a legitimate interest in preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business, regardless of whether it was an already established customer of the former employer.

*Century Bus. Servs., Inc. v. Urban*, 900 N.E.2d 1048, 1058 (Ohio Ct. App. 8 Dist. 2008) (citation omitted).

information of Huntington in his possession well after his termination. The Court is required to make credibility determinations, and it did not find Burke's testimony to be credible about the nature of his contacts with his former customers and coworkers. It was not persuaded by Burke's attempts to portray his contacts as non-solicitous. Furthermore, Burke's reasons for not immediately returning all of Huntington's confidential information that he had in his possession rang hollow.

Huntington has submitted evidence that it has suffered damages as a result of the breach. As of the date of its post-hearing briefing, twenty-one Huntington customers transferred some lines of insurance to Alliant and one employee had left employment at Huntington for Alliant. (ECF No. 54, p. 28).

Accordingly, the Court holds that Huntington has more than shown that it is likely to succeed on the merits of its breach of contract claims against Burke.

### B. HUNTINGTON HAS DEMONSTRATED A REASONABLE PROBABILITY OF SUCCESS ON THE MERITS AS TO THE TORTIOUS INTERFERENCE CLAIMS AGAINST ALLIANT.

Huntington has also met its burden to show a likelihood of success on the merits with regard to its tortious interference claims against Alliant. Under Pennsylvania law, the elements of a claim for tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with the contract; (3) the absence of privilege or justification on the part of defendant; and, (4) actual damages resulting from the defendant's interference.[11] *Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.*,71 A.3d 923, 933 (Pa. Super. 2013) (*citing Walnut St. Assoc., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. 2009), *aff'd*, 20

---

[11] The parties are in agreement that Pennsylvania law applies to the tortious interference claims (ECF No. 54, p. 24; ECF No. 56, p. 29), and the Court concurs.

A.3d 468 (Pa. 2011)); *The York Grp., Inc. v, Yorktowne Caskets, Inc.*, 924 A.2d 1234, 1245 (Pa.

Super. 2007) (same); *see also Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 393 A.2d

1175, 1183 (Pa. 1978). The plaintiff is not required to prove ill will or bad motive but must

show that the defendant acted with specific intent to interfere in the contractual relationship.

*Geyer v. Steinbronn*, 506 A.2d 901, 910 (Pa. Super. 1986).

Huntington presented sufficient evidence demonstrating a substantial likelihood that it

would succeed on its claims that Alliant intentionally and tortiously interfered with Burke's

obligations under the Producer's Agreement and RSU Agreements as well as Huntington's valid

business relationships with its customers. Before Burke's termination, Huntington had business

relationships with all customers serviced by Burke. Prior to joining Alliant, Burke provided Bly

with his Huntington Agreements. In negotiations with Burke, Bly was clear that he expected

Burke to be able to bring to Alliant his book of business. Upon joining Alliant, Burke provided

Bly with contact information for all of his Huntington customers. Alliant then sent an

announcement to all of those customers. This was followed by Burke or Bly contacting all of

Burke's former Huntington customers. Prior to joining Alliant, Burke also provided the names

of employees he thought might want to move to Alliant. Bly then had conversations with three

Huntington employees, and extended employment offers to two Huntington employees. While

Alliant has seemingly defended what occurred as its competitive privilege, the question facing

the Court at this stage is whether Huntington introduced sufficient evidence demonstrating a

substantial likelihood that Alliant's interference with Huntington's customers and employees was

intentional and improper. The Court finds credible evidence was presented at the hearing to

demonstrate a substantial likelihood that it was. Moreover, as previously noted herein,

Huntington has submitted more than adequate evidence that it has suffered damages as a result of

the breach.   As of the date of its post-hearing briefing, twenty-one Huntington customers transferred some lines of insurance to Alliant and one employee had left employment at Huntington for Alliant.  (ECF No. 54, p. 28).

Accordingly, the Court holds that Huntington has more than shown that it is likely to succeed on the merits of its tortious interference claims against Alliant.

### C. THE REMAINING ELEMENTS OF A PRELIMINARY INJUNCTION HAVE BEEN MET BY HUNTINGTON.

The remaining elements of a preliminary injunction have also been met.  Huntington has sufficiently demonstrated that it would likely suffer irreparable harm if a preliminary injunction was not granted.  Courts have recognized that a company is irreparably harmed when an ex-employee violates these types of provisions and pursues the company's customers.  Preservation of customer relationships is a legitimate business interest that is worthy of protection. The likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate.  The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to determine.  As previously discussed, Huntington is likely to establish that Burke had access to trade secrets and confidential information. It is also uncontested that Burke began working for a direct competitor of Huntington in a substantially similar capacity.  Accordingly, Huntington has established that Burke's breach of the Agreements by working at Alliant and soliciting Huntington customers and employees constitutes actual irreparable harm.  Business and employees have been diverted from Huntington.  Further, while money damages could be recovered for the losses arising from any customers who have left Huntington for Alliant, an injunction is necessary to prevent irreparable harm and loss of goodwill and relationships with customers who have remained with Huntington, despite Defendants' overtures.

23

Further, an injunction will not cause harm to others. Neither party has presented any evidence that enforcing the Agreement's provisions would cause any harm to third parties. To the extent that an injunction would harm Defendants, when Burke was terminated by Huntington, he was fully aware of his restrictive covenants. Not only did he plot how to evade them, but he went so far as to negotiate an indemnity provision with Alliant should he be sued by Huntington for violating the restrictive covenants. From the evidence presented, Burke and Alliant anticipated the lawsuit Huntington would file to enforce the terms of the Agreements. The Court finds that any harm to Burke and Alliant is a result of their intentional actions; Defendants flouted the terms Burke expressly agreed to in the Agreements.

Should an injunction issue, Burke will not be left destitute. He is employed now by a private equity owned national broker that has over 4,000 employees with nine industry practices and $ 1.7 billion of revenue. While Burke has represented that his career will suffer, that simply cannot be said based on the information presented to the Court. Burke is not prohibited from working or using the skills and experiences he developed at Huntington. He is not barred from providing insurance advice and services to individuals who were not his customers or prospective customers while he was employed by Huntington. The harms to Burke simply do not outweigh the harms that Huntington faces. Huntington faces continued breach of contract, risk of misappropriation of its confidential business data and trade secrets, and the probability of Alliant acquiring an unfairly achieved competitive advantage through acquisition of its customers and employees. Burke's demonstrable ability to find work as a broker less than a month after his separation from Huntington mitigates against any harm.

Finally, the enforcement of reasonable non-solicitation and confidentiality provisions is in the public's interest as individuals and entities who enter into these types of contracts should

expect that courts will enforce them in the event of a breach. The Court promotes the enforceability of bargained-for contracts, and contractual terms, by requiring Burke to uphold his legal obligations in good faith. Enforcement of the restrictive covenants will not harm the public.

The Court holds that the balance of equities lies in favor of enforcing the restrictive covenants and confidential information provisions in the Agreements. The legal remedy is inadequate to compensate for the harm caused by Defendants. There is a substantial likelihood that Burke has breached the restrictive covenants by soliciting Huntington customers and by seemingly using misappropriated confidential information to gain a competitive advantage over Huntington. Huntington has already lost twenty-one customers' lines of insurance, and one employee. Huntington has no adequate legal remedy. Defendants have taken a permanent bite out of Huntington's customer goodwill, and this damage could never be calculated in monetary terms, nor could the continued solicitation of Huntington's customers and employees be prohibited in any way except by injunction. As the facts revealed, Huntington's conduct demonstrates that there exists a present, actual threat of unlawful dissemination of confidential information and solicitation of Huntington's customers and employees. Thus, Huntington's fear of future injury is real and not imagined.

## IV.   CONCLUSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).   In this case, after balancing all four factors, the Court concludes that a preliminary injunction is more than appropriate.   Huntington's Motion for Preliminary Injunction is granted.   (ECF No. 3).   An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Dated:  October 29, 2020