## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HUNTINGTON BANCSHARES INCORPORATED and HUNTINGTON INSURANCE, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Jury Trial Demanded |
| v. | ) ) | Case No. 2:20-cv-1159 |
| RYAN BURKE and ALLIANT INSURANCE SERVICES, INC., | ) ) ) | |
| Defendants. | ) ) | |

### DEFENDANTS ALLIANT INSURANCE SERVICES AND RYAN BURKE'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT

Defendants Alliant Insurance Services, Inc. ("Alliant") and Ryan Burke ("Burke") hereby answer the amended complaint of Plaintiffs Huntington Bancshares Incorporated ("HBI") and Huntington Insurance, Inc. ("Huntington") and assert affirmative defenses thereto.

## I.     ANSWER

Defendants explicitly deny all allegations not specifically admitted. Any factual assertion admitted, moreover, is admitted only as to the specific facts set forth in the admission and not as to any other facts or as to any conclusions, characterizations, implications, or speculations—or narrative headings—that are contained in the allegation, or in the amended complaint as a whole. This limitation is hereby incorporated below into each response to the numbered paragraphs of the amended complaint.

### NATURE OF THE ACTION

1.      This action arises out of Burke's use and disclosure of Huntington's confidential and proprietary information, and Burke and Alliant's blatant solicitation of Huntington's customers and employees in direct violation of Burke's contractual obligations to Huntington.

**ANSWER**:    Denied.

2.      Burke began employment with Huntington in 2006 as an insurance producer, following the January 3, 2006 Plan of Merger between Huntington's predecessor (Sky Insurance, Inc.) and the Peter B. Burke Agency ("Burke Agency").  As part of that Plan of Merger, the Burke Agency provided its customer list which formed part of the consideration of the merger between the parties ("Merger Customer List").

**ANSWER**:      Defendants admit that Burke began his employment with Huntington in 2006 as an

insurance producer following the January 3, 2006 Plan of Merger between Huntington's

predecessor Sky Insurance, Inc. ("Sky Insurance") and the Peter B. Burke Agency ("Burke

Agency"). The remaining allegations in paragraph 2 are denied.

3.      On the same date as the Plan of Merger, Burke entered into a Producer's Agreement with Sky Insurance, Inc. ("Sky Insurance").   A true and correct copy of the Producer's Agreement is attached hereto as Exhibit A.

**ANSWER**:      Defendants admit that Burke entered into a Producer's Agreement with Sky

Insurance on around January 3, 2006 and that a true and correct copy of the Producer's Agreement

is attached to the amended complaint as Exhibit A. Defendants lack information or knowledge

sufficient to form a belief about the truth of the remaining allegations in paragraph 3.

4.      The Producer's Agreement prohibited Burke from using or disclosing confidential information or soliciting customers and employees after the termination of his employment.

**ANSWER**:      Paragraph 4 asserts a legal conclusion for which no response is required.  To the

extent an answer is deemed required, the allegations in paragraph 4 are denied.

5.      As an insurance producer, Burke was responsible for developing new insurance customers, selling insurance products to new and existing customers, and servicing the accounts of new and existing insurance customers.

**ANSWER**:      Defendants deny the allegations in paragraph 5 as vague and ambiguous.

Defendants admit, however, that as an insurance producer, among other things, Burke sought to

broker insurance policies to certain new and existing customers and to service their accounts.

6.      During his fourteen (14) years of employment with Huntington, Burke was promoted several times, with a final position of Insurance Sales Executive Senior.  At all times,

Burke's responsibilities included selling insurance products, including policies and bonds, obtaining customers for Huntington, and maintaining new and existing customer relationships.

**ANSWER**:   Defendants deny that Burke was promoted several times. Defendants deny the

remaining allegations in paragraph 6 as vague and ambiguous. Defendants admit, however, that

during his tenure at Huntington, among other things, Burke sought to broker insurance policies to,

and obtaining bonding for, certain new and existing customers and to service their accounts.

7.      On June 18, 2020, Huntington terminated Burke.

**ANSWER**:   Admitted.

8.      Immediately after his termination, Burke, in violation of his contractual obligations, began to contact Huntington's customers to inform them that he was no longer employed by Huntington and to solicit their business, either directly or indirectly, for his new employer.

**ANSWER**:   Denied.

9.      Burke is now employed with Alliant at its Pittsburgh, Pennsylvania office.  Alliant sells personal and commercial insurance policies and is a competitor of Huntington.

**ANSWER**:   Admitted except that Defendants deny that Alliant is a competitor of Huntington's

in every market in which Alliant and/or Huntington operates.

10.      Burke is employed with Alliant as a First Vice President and Client Executive. Burke's position and job responsibilities at Alliant are the same as or similar to his position and job duties at Huntington.

**ANSWER**:   Defendants admit that Burke is employed as a First Vice President at Alliant, but

deny that his job responsibilities are the same as they were at Huntington. The remaining

allegations in paragraph 10 are denied.

11.      Burke is currently using and disclosing Huntington's confidential and proprietary information.  Alliant is likewise using Huntington's confidential and proprietary information as Burke has disclosed such information to Alliant.

**ANSWER**:   Denied.

12.     Burke and Alliant are currently contacting and soliciting Huntington's customers to terminate their relationship with Huntington and purchase their insurance products and services from Alliant.

**ANSWER**:     Denied.

13.     Alliant, with the assistance of Burke, is also contacting and soliciting Huntington's employees to leave their employment with Huntington and join Alliant.

**ANSWER**:     Defendants admit that Alliant, not Burke, made offers of employment to two Huntington employees after Huntington terminated Burke. The remaining allegations in paragraph 13 are denied.

14.     Huntington files the present action asserting causes of action against Burke and Alliant for breach of contract and tortious interference with contracts and business relationships.

**ANSWER**:     Paragraph 14 does not assert facts that require a response. To the extent a response is required, Defendants admit that Huntington's amended complaint asserts the causes of action described in paragraph 14.

15.     As a result of Burke and Alliant's unlawful acts, Huntington has sustained substantial injuries for which it seeks appropriate judicial relief including, but not limited to, injunctive relief, recovery of actual damages (including compensatory and consequential damages), punitive damages, pre- and post-judgment interest, costs of court, and attorneys' fees.

**ANSWER**:     Denied.

## THE PARTIES

16.     Huntington Bancshares Incorporated ("HBI") is a Maryland corporation with its principal place of business at 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093.

**ANSWER**:     Defendants lack information or knowledge sufficient to form a belief about the truth of the allegations in paragraph 16.

17.     Huntington Insurance, Inc. ("HII") is an Ohio corporation with its principal place of business at 37 W. Broad Street, Columbus, Ohio 43215.

**ANSWER**:     Defendants lack information or knowledge sufficient to form a belief about the truth of the allegations in paragraph 17.

18.     Burke is an adult individual residing at 664 Arbor Court, Pittsburgh, Pennsylvania 15238.

**ANSWER**:     Admitted.

19.     Alliant is a California corporation with its principal place of business at 1301 Dove Street, Suite 200 Newport Beach, California 92660.

**ANSWER**:     Admitted.

<u>**JURISDICTION AND VENUE**</u>

20.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) based on complete diversity of citizenship between Huntington, Burke, and Alliant and because the amount in controversy exceeds $75,000. HBI is a citizen of Maryland. HII is a citizen of Ohio. Burke is a citizen of Pennsylvania. Alliant is a citizen of California.

**ANSWER**:     Defendants lack information or knowledge sufficient to form a belief about the truth of the allegations in paragraph 20.

21.     This Court has personal jurisdiction over Alliant because Alliant's actions have occurred in Pennsylvania, have been directed against Huntington in Pennsylvania, and have caused damage to Huntington in Pennsylvania.

**ANSWER**:     Defendants admit that the Court has personal jurisdiction over Alliant because some or all of the alleged conduct occurred in Pennsylvania. The remaining allegations in paragraph 21 are denied.

22.     Venue is proper in this Court because the events giving rise to the claims have occurred in this District.

**ANSWER**:     Defendants admit that statutory venue is proper and that at least some of the alleged events purportedly giving rise to the claims occurred in this District. Defendants deny the remaining allegations in paragraph 22 and deny that the case was properly filed in this District purportedly under the operative choice of venue provisions in the agreements between Burke and Huntington.

## FACTUAL BACKGROUND

**A.      Huntington's Business.**

23.     Huntington is a commercial and personal insurance agency that offers insurance products from leading insurance companies. Huntington also offers surety bonds.

**ANSWER**:     Defendants admit that Huntington is a commercial and personal insurance agency

and also offers surety bonds. Defendants deny the remaining allegations in paragraph 23.

24.     Huntington has an office located in Pittsburgh, Pennsylvania and has customers throughout the geographic region for whom it acts as an insurance agent and surety.

**ANSWER**:     Defendants admit that Huntington has an office in Pittsburgh, Pennsylvania.

Defendants deny the remaining allegations in paragraph 24.

25.     The insurance industry is highly competitive with many companies offering similar services. Because of the competitive nature of the industry, Huntington's relationships with its customer are essential to Huntington's ability to compete in the marketplace. As such, Huntington has invested and continues to invest significant time and resources to develop and preserve its customer relationships and goodwill.

**ANSWER**:     Defendants admit that certain segments of the insurance industry are highly

competitive and that, within those segments, many companies offer similar services. The

remaining allegations in paragraph 25 are denied.

26.     Huntington's confidential and proprietary information, including but not limited to, information about its customers, is also of vital importance to Huntington's ability to compete in the insurance industry. As such, Huntington has invested and continues to invest significant time and resources in developing its confidential and proprietary information and maintaining the confidentiality of such information for its competitive advantage.

**ANSWER**:     Denied.

27.     Huntington takes reasonable steps to protect its confidential and proprietary information, including, but not limited to, storing its information on password-protected computers, restricting access to the information, encrypting information, maintaining confidentiality policies, and requiring employees to sign agreements with confidentiality provisions.

**ANSWER**:     Paragraph 27 asserts a legal conclusion for which no response is required. To the extent an answer is deemed required, Defendants admit that Huntington takes the asserted steps to protect certain information Huntington asserts to be confidential or proprietary. Defendants deny the remaining allegations in paragraph 27.

**B.     Burke's Employment with Huntington.**

28.     On January 3, 2006, Sky Insurance merged with the Peter B. Burke Agency, Inc.

**ANSWER**:     Defendants admit that Sky Insurance merged with the Burke Agency on or about January 3, 2006.

29.     On that same date, Burke entered into a Producer's Agreement with Sky Insurance. *See* Exhibit A.

**ANSWER**:     Defendants admit that Burke entered into a Producer's Agreement with Sky Insurance on or about January 3, 2006.

30.     Huntington and Sky Insurance subsequently merged on or around May 5, 2008.

**ANSWER**:     Defendants admit that Huntington and Sky Insurance merged, but lack information or knowledge sufficient to form a belief about the truth of the remaining allegations in paragraph 30.

31.     Burke's duties while at Huntington included, but were not limited to, developing new customers, selling insurance products, including policies and bonds, to new and existing customers, and servicing customers and their accounts on behalf of Huntington.

**ANSWER**:     Defendants deny the allegations in paragraph 31 as vague and ambiguous. Defendants admit, however, that as an insurance producer, among other things, Burke sought to broker insurance policies to, and obtain bonds for, certain new and existing customers and to service their accounts.

32.     Burke had access to and learned confidential and proprietary information of Huntington, including but not limited to, information about Huntington's operational methods, products and services, pricing, costs, sourcing, contracts, sales techniques, and marketing plans

and strategies. In addition, Burke had access to and learned highly confidential information about Huntington's customers, including but not limited to, customer identities and contact information, insurance history, policy information, renewal and expiration data, and other customer account and transactional data.

**ANSWER**:    Denied. Defendants admit that Burke had access to certain actual confidential or

proprietary information of certain of Huntington's customers but deny that Paragraph 32

accurately states the relevant facts.

33.    Burke also had extensive contact and interaction with Huntington's customers. Burke worked closely with customers to sell insurance products and manage and service customer accounts. Huntington paid Burke to interact with, service, and be a point of contact for its customers.

**ANSWER**:    Defendants admit that Burke worked closely, and had extensive contact and

interaction, with certain customers to broker insurance products and manage and service those

customers' accounts. The remaining allegations in Paragraph 33 are denied.

34.    In the Producer's Agreement signed by Burke, Burke acknowledged that he had access to Huntington's Confidential Information and agreed that he would not use or disclose such Confidential Information:

> Employee acknowledges that his employment hereunder gives him access to Confidential Information...relating to Employer's Business and its customers which must remain confidential. Employee acknowledges that this information is valuable, special, and a unique asset of Employer's Business, and that it has been and will be developed by Employer at considerable effort and expense.... Employee hereby agrees and covenants that Employee will forever keep secret and confidential all Confidential Information and will not, directly or indirectly...disclose to any Person, or use or otherwise exploit for Employee's own benefit or for the benefit of any Person other than Employer, Confidential Information, whether prepared by Employee or not....

See Exhibit A at § 12.

**ANSWER**:    Defendants admit that Burke signed the Producer's Agreement and that paragraph

34 selectively and incompletely quotes language from Section 12 of that Agreement. The

remaining allegations in paragraph 34 are denied.

35.     The Producer's Agreement provides that Confidential Information includes, but is not limited to, customer identities and contact information, personally identifiable customer information, details of client contracts, pricing policies, sales techniques, information relating to customers, marketing plans and strategies, and products. *See* Exhibit A at § 21.

**ANSWER**:     Defendants admit the Producer's Agreement includes a definition of "confidential information."  The remaining allegations in paragraph 35 are denied.

36.     Burke further agreed that for a period of three (3) years following the termination of his employment he would not:

> (i)   cause, solicit or accept from any Customer any business relating to, similar to, or competitive with the Employer's Business, specifically recognizing that this prohibition extends not only to solicitation when initiated by Employee, but also to instances wherein Employee responds inquiries or communications initiated by Customer;

> (ii)  directly or indirectly...recruit, solicit or otherwise induce or influence any partner, director, officer, employee, sales agent...to discontinue, reduce or adversely modify such employment, agency or business relationship with the Employer; or

> (iii) employ or seek to employ or cause any Competitive Business to employ or seek to employee any Person or agent who is then...employed or retained by the Employer.

See Exhibit A at § 13A.

**ANSWER**:     Defendants admit that Section 13 of the Producer's Agreement includes language that has been selectively and incompletely quoted and/or paraphrased in this paragraph. The remaining allegations in paragraph 36 are denied.

37.     Burke acknowledged and agreed that the restrictive covenants in Section 12 and 13 of the Producer's Agreement were reasonable and necessary for the protection of Huntington's legitimate business interests. See Exhibit A at § 14.

**ANSWER**:     Defendants admits that the Producer's Agreement includes an enforceability clause that has bene selectively and incompletely paraphrased in this paragraph. The remaining allegations of paragraph 37 are denied.

38.     Burke also agreed that in the event of legal action to enforce the restrictions in the Producer's Agreement, the party against whom judgment is rendered shall pay the prevailing party's attorneys' fees and costs. *See* Exhibit A at § 14.

**<u>ANSWER</u>**:     Defendants admit the Producer's Agreement includes fee shifting provisions and

states the scope of those provisions are defined in the agreement.  The remaining allegations made

in paragraph 38 are denied.

39.     During his employment with Huntington, Burke also entered into a 2017 Restrictive Stock Unit Grant Agreement and 2019 Restrictive Stock Unit Grant Agreement (collectively, the "RSU Agreements"). A true and correct copy of the 2017 Restrictive Stock Unit Grant Agreement and 2019 Restrictive Stock Unit Grant Agreement are attached hereto as Exhibit B and Exhibit C, respectively.

**<u>ANSWER</u>**:     Admitted.

40.     In the RSU Agreements, Burke agreed that for the period of one (1) year following the termination of his employment, he would not, either directly or indirectly:

1.  Solicit, encourage, or induce any person employed by the Company, or attempt to solicit, encourage, or induce any person employed by the Company, to terminate...employment with the Company or to seek or accept employment with any other person or entity; or

2.  Contact or attempt to contact any customer or prospective customer of the Company for whom the Employee performed any services or had any direct or indirect business contact for the purpose of identifying his or her new association or his or her change of employment or current affiliation; or

3.  Contact any customer of the Company for whom the Employee performed any services or had any direct or indirect business contact for the purpose of soliciting, influencing, enticing, attempting to divert, or inducing any such customers to obtain any product or service offered by the Company from any person or entity other than the Company; or

4.  Contact any customer or prospective customer of the Company whose identity or other customer specific information the Employee obtained or gained access to as an employee of the Company for the purpose of soliciting, influencing, enticing, attempting to divert, or inducing any such customers or prospective customers to obtain any product or service provided

by the Company from any person or entity other than the Company; or

5.  Accept or provide assistance in the accepting of business from any customers or any prospective customers of the Company for whom the Employee performed any services or had any direct or indirect business contact, or whose identity or other customer specific information the Employee obtained or gained access to as an employee of the Company.

*See* Exhibits B and C, Non-Solicitation Provision.

**ANSWER**:   Defendants admit that the RSU Agreements include language that has been selectively and incompletely quoted and/or paraphrased in this paragraph. The remaining allegations in paragraph 40 are denied.

41.   Burke also agreed that he would not, either directly or indirectly, disclose or use any Confidential Information of Huntington. Confidential Information includes, but is not limited to, any information regarding "any customer and/or prospective customer, including names, addresses, telephone numbers, email addresses, lists of any other identifying or contact information, account or transactional information, and other personal, business or financial information...." *See* Exhibit C, Confidential Information Provision.

**ANSWER**:   Defendants admit that the RSU Agreements include language that has been selectively and incompletely quoted and/or paraphrased in this paragraph.  The remaining allegations in paragraph 41 are denied.

42.   Burke further agreed that he would not, either directly or indirectly:

use proprietary information to solicit, influence, entice, attempt to divert, or induce any customer or prospective customer of the Company to terminate or reduce any business relationship with the Company or to obtain any product or service provided by the Company from any person or entity other than the Company.

See Exhibit B, Confidentiality Provision.

**ANSWER**:   Defendants admit that the RSU Agreements include language that has been selectively and incompletely quoted and/or paraphrased in this paragraph.  The remaining allegations in paragraph 42 are denied.

43.     Burke was terminated by Huntington on June 18, 2020.

**ANSWER**:     Admitted.

44.     Under the terms of the Producer's Agreement, and per Huntington policy, upon termination of employment, Burke was to return to Huntington all equipment, records, documents, specifications, writings and materials relating to the business of Huntington or constituting Confidential Information. *See* Exhibit A at § 17.

**ANSWER**:     Defendants deny the allegations in paragraph 44 as vague and ambiguous.

Defendants admit, however, that after Huntington terminated Burke and after a very diligent and

over-inclusive search by Burke, in conjunction with counsel, Burke delivered to Huntington any

documents, materials, or devices to which it might be entitled. Defendants deny that Burke used

any such documents, materials, or devices after his termination from Huntington or in the course

of his employment with Alliant.

45.     On the day after Burke was terminated, Huntington, through In-House counsel, sent a letter to Burke to remind him of his post-employment obligations, including his obligation not to solicit or accept business from Huntington's customers. Huntington also reminded Burke of his obligation not to use or disclose Huntington's confidential and proprietary information. A true and correct copy of the June 19, 2020 letter to Burke is attached hereto as Exhibit D.

**ANSWER**:     Defendants admit that Burke received a letter purportedly dated June 19, 2020, and

that the contents of that letter speak for itself. The remaining allegations in paragraph 45 are denied.

**C.     Burke and Alliant Solicit Huntington's Customers and Employees.**

46.     A few days after Burke's termination, Huntington learned that Burke was using and disclosing Huntington's confidential and proprietary information and contacting Huntington's customers.

**ANSWER**:     Defendants admit that in the days after Huntington terminated Burke, Burke

contacted certain of his contacts, including certain Huntington customers, all of which Huntington

consented to. The remaining allegations in Paragraph 46 are denied.

47.     Huntington immediately notified Burke, by letter from legal counsel, that his conduct was in violation of the Producer's Agreement and RSU Agreements and demanded that

Burke comply with his legal obligations to Huntington. A true and correct copy of Huntington's June 26, 2020 letter to Burke is attached hereto as Exhibit E.

**ANSWER**:     Defendants admit that Burke received a letter purportedly dated June 26, 2020, and

that the contents of that letter speak for itself.  The remaining allegations in paragraph 47 are

denied.

48.     Shortly thereafter, Huntington learned that Burke was continuing to contact Huntington's customers and was soliciting Huntington's customers to obtain insurance products and services from his new employer Alliant, instead of Huntington. Some of the customers contacted were on the Merger Customer List for which Huntington's predecessor paid significant consideration.

**ANSWER**:     Denied.

49.     In soliciting Huntington's customers, Burke has not only improperly used Huntington's confidential and proprietary information, but he has also unlawfully disclosed such information to Alliant.

**ANSWER**:     Denied.

50.     Alliant, after receiving Huntington's confidential and proprietary information from Burke, has used and is continuing to use such information to solicit Huntington's customers.

**ANSWER**:     Denied.

51.     The Managing Director of Alliant's Pittsburgh office, Jim Bly ("Bly"), has sent emails to Huntington's customers with an announcement that Burke has joined Alliant and a request to schedule a telephone call to discuss "the advantages" of Alliant, "including some significant savings opportunities."

**ANSWER**:     Defendants admit that Mr. Bly sent certain individuals with whom he had pre-

existing relationships, and who may also have been Huntington customers, an email noting the

Burke had joined Alliant and offering a telephone call to discuss the advantage of Alliant and some

significant savings opportunities. Burke was not involved in any emails offering a telephone call

to discuss the advantage of Alliant and some significant savings opportunities. The remaining

allegations in paragraph 51 are denied.

52.     Alliant's Vice President, Account Executive, Construction Services Group, Pamela Nunez, has sent unsolicited emails to Huntington's customers, asking the customers to "prepare broker of record letters for us [Alliant] to take over your policies."

**ANSWER**:     Denied.

53.     Alliant, with the assistance of Burke and information provided by Burke, has also solicited Huntington's employees to terminate their employment with Huntington and join Alliant.

**ANSWER**:     Defendants admit that Alliant made two offers of employment to Huntington employees after Huntington terminated Burke. The remaining allegations in paragraph 53 are denied.

54.     Alliant, through Bly and acting with the assistance of Burke, has extended an offer of employment to at least one Huntington employee and has contacted other Huntington employees regarding employment with Alliant.

**ANSWER**:     Defendants admit that Alliant made two offers of employment to Huntington employees after Huntington terminated Burke. The remaining allegations in paragraph 54 are denied.

55.     On July 28, 2020, Huntington provided Burke with a final letter, again demanding that Burke comply with his legal obligations under the Producer's Agreement and the RSU Agreements. A true and correct copy of the July 28, 2020 letter is attached hereto as Exhibit F.

**ANSWER**:     Defendants admit that Burke received a letter purportedly dated July 28, 2020, attached to amended complaint as Exhibit F, and that the contents of that letter speak for themselves. The remaining allegations in paragraph 55 are denied.

56.     Huntington also provided a copy of the July 28, 2020 letter to Alliant.

**ANSWER**:     Defendants admit that Alliant received a letter purportedly dated July 28, 2020, and that the contents of that letter speak for themselves. The remaining allegations in paragraph 56 are denied.

57.     Neither Burke nor Alliant responded to the letter and Huntington's demand that Burke cease and desist his violations of the Producer's Agreement and RSU Agreements.

**ANSWER**:      Denied.

58.      Burke and Alliant's continued use and disclosure of Huntington's confidential and proprietary information and solicitation of Huntington's customers and employees is likely or inevitable.

**ANSWER**:      Denied.

59.      Burke and Alliant's wrongful and unlawful conduct has caused and is continuing to cause substantial harm to Huntington.

**ANSWER**:      Denied.

60.      To date, three (3) customers have terminated their relationship with Huntington and transferred their insurance business to Alliant.

**ANSWER**:      Defendants are aware that as of the date of the amended complaint, three or more Huntington customers had terminated certain at-will brokerage agreements with Huntington and transferred certain business to Alliant.  The remaining allegations in paragraph 60 are denied.

**COUNT I**
**Breach of the Producer's Agreement**
**Huntington v. Burke**

61.      Huntington incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

**ANSWER**:      Defendants repeat and reallege their responses to the unidentified preceding paragraphs as if fully set forth herein.

62.      The Producer's Agreement is a valid and binding contract between Burke and Huntington.

**ANSWER**:      Paragraph 62 asserts a legal conclusion for which no response is required.  To the extent an answer is deemed required, the allegations are denied.

63.      The restrictive covenants in the Producer's Agreement are enforceable.

**ANSWER**:      Paragraph 63 asserts a legal conclusion for which no response is required.  To the extent an answer is deemed required, the allegations are denied.

64.     Burke has breached and continues to breach the Producer's Agreement by: (a) using and disclosing Huntington's Confidential Information; (b) soliciting Huntington's customers; (c) accepting business from Huntington's customers; (d) soliciting or inducing Huntington's employees to discontinue their employment with Huntington; (e) causing Alliant to seek to employ Huntington's employees; and (f) failing to return to Huntington its property and Confidential Information.

**ANSWER**:     Denied.

65.     The breaches set forth in the preceding paragraph are each independently material.

**ANSWER**:     Denied.

66.     Huntington has performed its obligations and satisfied all conditions precedent to the Producer's Agreement.

**ANSWER**:     Denied.

67.     Burke's conduct is a direct and proximate cause of damages to Huntington in an amount to be established at trial.

**ANSWER**:     Denied.

68.     Burke's breaches of the Producer's Agreement have caused and will continue to cause, immediate and irreparable harm to Huntington.

**ANSWER**:     Denied.

69.     Unless Burke is preliminarily and permanently enjoined from further breaches of the Producer's Agreement, Burke will continue to breach his obligations to Huntington and Huntington will continue to suffer irreparable harm, loss, and injury.

**ANSWER**:     Denied.


### COUNT II
### Breach of the Restrictive Stock Unit Grant Agreements
### Huntington v. Burke

70.     Huntington incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

**ANSWER**:     Defendants repeat and reallege their responses to the unidentified preceding paragraphs as if fully set forth herein.

71.     The RSU Agreements are valid and binding contracts between Burke and Huntington.

**ANSWER**:     Paragraph 71 asserts a legal conclusion for which no response is required.  To the extent an answer is deemed required, the allegations are denied.

72.     The restrictive covenants in the RSU Agreements are enforceable.

**ANSWER**:     Paragraph 72 asserts a legal conclusion for which no response is required.  To the extent an answer is deemed required, the allegations are denied.

73.     Burke has breached and continues to breach the RSU Agreements by: (a) using and disclosing Huntington's Confidential Information; (b) contacting Huntington's customers for purposes of identifying his change in employment; (c) contacting Huntington's customers for purposes of soliciting such customers to obtain a product or service offered by Huntington from Alliant; and (d) soliciting or inducing Huntington's employees to terminate their employment with Huntington or accept employment with Alliant.

**ANSWER**:     Denied.

74.     The breaches set forth in the preceding paragraph are each independently material.

**ANSWER**:     Denied.

75.     Huntington has performed its obligations and satisfied all conditions precedent to the RSU Agreements.

**ANSWER**:     Denied.

76.     Burke's conduct is a direct and proximate cause of damages to Huntington in an amount to be established at trial.

**ANSWER**:     Denied.

77.     Burke's breaches of the RSU Agreements have caused and will continue to cause, immediate and irreparable harm to Huntington.

**ANSWER**:     Denied.

78.     Unless Burke is preliminarily and permanently enjoined from further breaches of the RSU Agreements, Burke will continue to breach his obligations to Huntington and Huntington will continue to suffer irreparable harm, loss, and injury.

**ANSWER**:     Denied.

## COUNT III
### Tortious Interference with Contracts
### Huntington v. Alliant

79.     Huntington incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

**ANSWER**:     Defendants repeat and reallege their responses to the unidentified preceding

paragraphs as if fully set forth herein.

80.     The Producer's Agreement and the RSU Agreements are valid and binding contracts between Burke and Huntington that prohibit Burke from, among other things, using and disclosing Huntington's confidential and proprietary information, contacting Huntington's customers for purposes of identifying his change in employment, contacting Huntington's customers for purposes of soliciting such customers to obtain a product or service offered by Huntington from another entity, soliciting or inducing Huntington's employees to terminate their employment with Huntington or accept employment with another entity, and causing a competitive business to seek to employ any Huntington employee.

**ANSWER**:     Paragraph 80 asserts a legal conclusion for which no response is required.  To the

extent an answer is deemed required, the allegations are denied.

81.     Alliant has knowledge of the Producer's Agreement and RSU Agreements and Burke's obligations under the agreements.

**ANSWER**:     Defendants admit that as of the date of this filing, Alliant is aware of the Producer

Agreement and RSU Agreements and of Burke's purported obligations under each. Defendants

deny the remaining allegations in Paragraph 81.

82.     Nonetheless, Alliant has encouraged and permitted Burke to: (a) use and disclose Huntington's confidential and proprietary information; (b) contact Huntington's customers for purposes of identifying his new employment and soliciting such customers to terminate their relationship with Huntington and obtain insurance products and services from Alliant; and (c) aid in Alliant's solicitation of Huntington's employees.

**ANSWER**:     Denied.

83.     Alliant has acted without justification or privilege.

**ANSWER**:     Denied.

84.     Alliant's conduct is a direct and proximate cause of damages to Huntington in an amount to be established at trial.

**ANSWER**:     Denied.

85.     Alliant's conduct has caused and will continue to cause immediate and irreparable harm to Huntington.

**ANSWER**:     Denied.

86.     Alliant's conduct has been intentional, willful, malicious, and in reckless disregard of Huntington's rights, and therefore, the imposition of punitive damages is warranted.

**ANSWER**:     Denied.

87.     Unless Alliant is preliminarily and permanently enjoined from engaging in the above conduct, Burke will continue to breach his obligations to Huntington and Huntington will continue to suffer irreparable harm, loss, and injury.

**ANSWER**:     Denied.

## COUNT IV
### Tortious Interference with Business Relationships
### Huntington v. Alliant

88.     Huntington incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

**ANSWER**:     Defendants repeat and reallege their responses to the unidentified preceding paragraphs as if fully set forth herein.

89.     Huntington has contractual and prospective business relationships with its customers and employees.

**ANSWER**:     Defendants deny knowledge or information sufficient as to form a belief regarding Huntington's relationships with its customers and employees, and therefore denies the allegations in this paragraph.

90.     By using Huntington's confidential and proprietary information, contacting and soliciting Huntington's customers to terminate their relationship with Huntington and purchase insurance products and services from Alliant, and soliciting Huntington employees to terminate their employment with Huntington, Alliant has tortuously interfered with Huntington's contractual and prospective business relationships.

**ANSWER**:   Denied.

91.   Alliant has engaged in the aforementioned wrongful conduct with the purpose and intent to harm Huntington's contractual and prospective business relationships.

**ANSWER**:   Denied.

92.   Alliant has acted without justification or privilege.

**ANSWER**:   Denied.

93.   Alliant's conduct is a direct and proximate cause of damages to Huntington in an amount to be established at trial.

**ANSWER**:   Denied.

94.   Alliant's conduct has caused and will continue to cause immediate and irreparable harm to Huntington.

**ANSWER**:   Denied.

95.   Alliant's conduct has been intentional, willful, malicious, and in reckless disregard of Huntington's rights, and therefore, the imposition of punitive damages is warranted.

**ANSWER**:   Denied.

96.   Unless preliminarily and permanently enjoined, the acts of Alliant alleged herein will continue to cause Huntington irreparably harm, loss, and injury.

**ANSWER**:   Denied.

WHEREFORE, Defendants pray that the Court: (i) enter judgment for them and against Plaintiffs; (ii) deny Plaintiffs any relief, (iii) award Defendants their attorney's fees and costs; and (iv) award Defendants any other relief the Court deems just and proper.


## II.   AFFIRMATIVE DEFENSES

Defendants hereby assert affirmative and other defenses to Plaintiffs' amended complaint. In asserting these affirmative defenses, Defendants do not intend to assume, shift, or diminish Plaintiffs' burden of proof on their claims. Nor do Defendants intend to waive any affirmative or

other defenses that they are unaware of currently, or that they are not required by the Federal Rules of Civil Procedure to plead before asserting. Defendants reserve all rights to modify or supplement their affirmative defenses, by seeking leave of Court or as otherwise provided for by law. Defendants' answer to the amended complaint, including their responses to each numbered paragraph of the amended complaint, are hereby incorporated into Defendants' affirmative defenses as if they had been fully set forth below.

### 1. Promissory Estoppel

1.      Huntington, through its managers William Fetcko and/or Steve Phillips, gave Burke explicit permission to contact his friends and clients to inform them of his termination from Huntington and the circumstances thereof.

2.      Implicit in that permission was the promise that Huntington would not seek judicial relief against Burke for contacting his friends and clients as described.

3.      Burke relied on that permission and contacted certain of his friends and clients in the days following his termination by Huntington.

4.      Plaintiffs are now suing over those contacts.

5.      Plaintiffs' claims with regard to those contacts are barred by the doctrine of promissory estoppel.

### 2. Equitable Estoppel

6.      Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

7.      For the same reasons Plaintiffs' claims about Burke's post-termination contacts with friends and clients are barred by the doctrine of promissory estoppel, they are also barred by equitable estoppel.

8.      It would be unjust to permit Plaintiffs to complain about contacts between Burke and his friends and clients that Plaintiffs explicitly authorized.

### 3. Duress

9.      Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

10.     Burke had no option or ability to negotiate the Producer's Agreement.

11.     It was represented to Burke that if he did not execute the Producer's Agreement, he would encumber the merger between Sky Insurance and the Burke Agency.

12.     Burke, believing that he had no choice, executed the Producer Agreement under duress.

### 4. Unconscionability

13.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

14.     For the same reasons the Producer Agreement was signed under duress, its execution was procedurally unconscionable.

15.     Execution of the RSU Agreements was also procedurally unconscionable.

16.     Burke was told that the RSU Agreements were being granted as awards, and that he simply needed to click through the Agreements on a computer screen to claim the awards.

17.     Plaintiffs did not advise Burke that the RSU Agreements contained restrictive covenants, and Burke did not have knowledge of the restrictive covenants when he executed the RSU Agreements online.

18.     The restrictive covenants in the Producer Agreement and RSU Agreements, as interpreted by Plaintiffs, are also substantively unconscionable.

19.     The restrictive covenants, as interpreted by Plaintiffs, would prevent Burke from earning a living in his chosen profession of roughly two decades by barring him from, among other things, doing business with the customers and other relationships that enable him to generate value for his employer.

20.     They would further require Burke to develop an entirely new professional network in the Pittsburgh area in the midst of a global pandemic.

21.     Developing an entirely new professional network in the Pittsburgh area under current economic conditions, during the COVID-19 pandemic, is impossible.

### 5. Laches

22.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

23.     Plaintiffs waited 46 days after Huntington terminated Burke to file this action.

24.     Plaintiffs delayed filing this lawsuit despite allegedly learning, within days of his termination, that Burke was purportedly violating the restrictive covenants at issue.

25.     During Plaintiffs' delay, Burke sought and obtained employment from Alliant, and numerous clients moved their business to Alliant.

26.     Defendants would thus be prejudiced if the restrictive covenants were now enforced according to Plaintiffs' interpretations thereof.

### 6. License / Permission

27.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

28.     Huntington gave Burke explicit permission to contact his clients and friends after he was terminated to inform them of his termination and the circumstances thereof.

29.     Burke thus acted under the license granted him by Huntington.

## 7. Waiver

30.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

31.     To the extent the Producer Agreement or the RSU Agreements barred Burke form contacting his clients and friends to inform them of his termination from Huntington and the circumstances thereof, Plaintiffs waived those prohibitions when Huntington gave Burke express permission to contact his clients and friends to so inform them.

32.     Plaintiffs further waived the singular Ohio choice of law and choice of forum provisions in the Producer Agreement and the RSU Agreements by filing suit in Pennsylvania in knowing violation of those provisions.

33.     Plaintiffs further waived any non-disparagement obligations of Burke by disparaging Burke to third parties on multiple occasions.

## 8. Failure to Perform

34.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

35.     The Producer Agreement and RSU Agreements set forth a variety of proprietary information and support that Huntington was to provide Burke.

36.     Huntington failed to provide such information or support.

37.     In addition, Section 11 of the Producer Agreement set forth limited criteria under which a termination could be labeled "for cause."

38.     The conduct for which Burke was purportedly terminated did not satisfy Section 11's for-cause criteria.

39.     Huntington's termination of Burke "for cause" on June 18, 2020 therefore violated Section 11 of the Producer Agreement.

40.     Huntington's termination of Burke "for cause" likewise violated the for-cause provisions of the RSU Agreements.

### 9. First to Breach

41.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

42.     Huntington's failures to perform under the Producer Agreement and the RSU Agreements constitute material breaches of those agreements.

43.     Because those breaches occurred before Burke's alleged breaches of the same agreements, Plaintiffs are precluded from suing Burke for breach of the Producer Agreement or the RSU Agreements.

### 10. Superseding Agreements

44.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

45.     The 2017 RSU Agreement explicitly superseded any previous agreement concerning the subject matter of the 2017 RSU Agreement.

46.     The subject matter of the 2017 RSU Agreement included restrictive covenants.

47.     The 2017 RSU Agreement restrictive covenants therefore superseded the restrictive covenants in the Producer Agreement, which was executed in 2006.

48.     Similarly, the 2019 RSU Agreement explicitly superseded any previous agreement concerning the subject matter of the 2019 RSU Agreement.

49.     The 2019 RSU Agreement restrictive covenants therefore superseded the restrictive covenants in the 2017 RSU Agreement.

### 11. Failure of a Condition Precedent / Failure of Consideration

50.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

51.     A condition precedent to the parties' performance under the 2019 RSU Agreement was the vesting of stock awarded to Burke under the agreement.

52.     When Huntington terminated Burke for cause, it prevented any stock from vesting.

53.     The parties are therefore excused from further performance under the 2019 RSU Agreement.

54.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

55.     Huntington never delivered some or all of the Restricted Stock Units to Burke that served as the consideration for the 2017 RSU Agreement.

56.     Huntington never delivered some or all of the Restricted Stock Units to Burke that served as the consideration for the 2019 RSU Agreement.

57.     The non-delivery of the Restricted Stock Units constituted a partial or full failure of consideration for the RSU Agreements.

58.     Burke is therefore excused from further performance under the RSU Agreements.

### 12. Failure to State a Claim

59.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

60.     For all of the reasons stated in Defendants' opposition to Plaintiffs' motion for a temporary restraining order, and other reasons that may be developed as the case progresses, Plaintiffs have failed to state any claim upon which relief may be granted.

### 13. Election of Remedies

61.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

62.     The sole remedy available to Plaintiffs for breach of restrictive covenants in the RSU Agreements is money damages in the form of a claw-back of any stock awards.

63.     Plaintiffs may not seek injunctive relief under the RSU Agreements as the Agreements explicitly provided for money damages.

### 14. Adequate Remedy at Law

64.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

65.     The value of Huntington's lost clients and/or employees is fully quantifiable.

66.     Plaintiffs' alleged harms are therefore compensable by money damages.

67.     Because Plaintiffs have an adequate remedy law, equitable relief is improper.

### 15. Unclean Hands

68.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

69.     Huntington's termination of Burke "for cause" was made in bad faith.

70.     Huntington's termination was based on, among other things and on information and belief, a desire to appease an insurance partner and/or to reduce Plaintiffs' costs by eliminating

Burke's compensation as an expense and extinguishing the grants of restricted stock previously made to him.

71.     Since terminating Huntington, and as part of a continuous campaign starting with termination to harm Burke's personal and professional reputation, relationships, and ability to earn a living, Huntington has made false and disparaging statements about Burke to customers, former customers, prospects, insurance carriers, and the Court. These statements include false claims about dishonesty on the part of the Burke and his conduct on behalf of a client that purportedly resulted in his termination from Huntington. These statements also include threats of adverse or dire consequences if the targets of these statements, namely customers, former customers, prospects, insurance carriers, do business with Burke or Alliant.

72.     Huntington's unclean hands bar Plaintiffs from seeking equitable relief.

## 16. Lack of Standing

73.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

74.     Burke never worked for HI.

75.     Burke never had any legal relationship with HBI.

76.     HBI therefore lacks standing to enforce any restrictive covenants against Burke.

77.     In addition, Plaintiffs have not produced, and Defendants are not aware of, any assignment of Burke's Producer Agreement with Sky Insurance to Plaintiffs.

78.     Plaintiffs therefore have no standing to sue under the Producer Agreement.

## 17. Competitor's Privilege

79.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

80.     As a competitor of Huntington in the Pittsburgh market, Alliant was privileged to compete with Huntington for customers and employees.

81.     Alliant did not use any improper or unlawful means to compete with Huntington for customers and employees.

82.     Alliant's actions are therefore protected by the competitor's privilege under both Pennsylvania and Ohio law.

### 18. Improper Venue

83.     Defendants incorporate by reference the allegations set forth in the above paragraphs of Defendants' affirmative defenses, as if fully set forth herein.

84.     The Producer Agreement provides for exclusive venue of any related lawsuits in Ohio.

85.     On information and belief, the binding terms of the RSU Agreements contained in the underlying stock award plans also provide for exclusive venue of any related lawsuits in Ohio.

86.     Venue in this Court is therefore improper.

WHEREFORE, Defendants pray that the Court: (i) enter judgment for them and against Plaintiffs; (ii) deny Plaintiffs any relief, (iii) award Defendants their attorney's fees and costs; and (iv) award Defendants any other relief the Court deems just and proper.

## III.   JURY DEMAND

Defendants hereby demand a jury trial on all triable by a jury.

*[Signatures on Following Page]*

**Respectfully Submitted,**

| | |
|---|---|
| DICKIE, McCAMEY & CHILCOTE, P.C. | AKERMAN LLP |
| **/s/  Frederick  W. Bode, III_____** | **/s/  Kasey Dunlap_____** |
| Frederick W. Bode, III, Esq. | Hon. Ruben Castillo (Ret.) |
| PA Id. No. 33391 | (admitted *pro hac vice*) |
| Michael P. Flynn, Esq. | Kasey Dunlap, Esq. |
| PA Id. No. 206150 | (admitted *pro hac vice*) |
| Michael A. Muha, Esq. | Julian Dayal, Esq. |
| PA. Id. No. 321216 | (admitted *pro hac vice*) |
| | |
| Two PPG Place, Suite 400 | 71 S. Wacker Drive, 47th Floor |
| Pittsburgh, PA  15222-5402 | Chicago, IL 60606 |
| (412) 281-7272 | (312) 634-5700 |
| | |
| rbode@dmclaw.com | ruben.castillo@akerman.com |
| mflynn@dmclaw.com | kasey.dunlap@akerman.com |
| mmuha@dmclaw.com | julian.dayal@akerman.com |

*Counsel for Defendants, Ryan Burke and Alliant Insurance Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this 21st day of January, 2021, the foregoing Answer to Plaintiffs' Amended Complaint was filed with the Court's electronic filing system, which will effect service of the same upon counsel via email.

*/s/ Frederick W. Bode, III*_____
Frederick W. Bode, III, Esq.